UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:12-CR-00005-FL-2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| | ) | |
| DERONTAE TREMAINE LEE | ) | |
| | ) | |

This cause comes before the Court upon Defendant's motion to suppress (DE-39) all evidence seized during a traffic stop that occurred on September 22, 2011. The government has responded (DE-44), and a hearing on the motion was held July 25, 2012. (DE-45, DE-47). In addition, the undersigned allowed the parties to submit supplemental memoranda following the evidentiary hearing. (DE-51, DE-52). Accordingly, the motion is ripe for adjudication. Pursuant to 28 U.S.C. § 636(b)(1), this matter has been referred to the undersigned for entry of a memorandum and recommendation. For the reasons stated herein, the undersigned recommends that Defendant's motion to suppress be denied.

I. **FACTUAL BACKGROUND**

Defendant is charged by way of indictment of being a felon in possession of a firearm and aiding and abetting in violation of 18 U.S.C. §§ 922(g)(1) and 924. (DE-1). These charges were brought after officers with the Onslow County Sheriff's Office discovered firearms during a search of a vehicle in which Defendant was a passenger. Defendant

now moves to suppress all evidence found during the search on the grounds that the traffic stop and search were unlawful.

At the evidentiary hearing, the Government presented the following evidence:

**Testimony by Robert Eugene Ides**

First Sergeant Robert Ides, a fourteen-year veteran of the Onslow County Sheriff's Office, testified that on the evening of September 22, 2011, he was on duty conducting surveillance of a residence in the Richlands area near Jacksonville, North Carolina. Mot. Supp. Hr'g Tr. 3:2-23, July 25, 2012. Sergeant Ides was driving an unmarked Crown Victoria patrol vehicle. Hr'g Tr. 4:18-19. Two other officers, Sergeant Sanders and Detective Gonzales, accompanied Sergeant Ides. Hr'g Tr. 4:23. At approximately 8:00 p.m., the three officers had concluded their surveillance and were returning to Jacksonville via NC Highway 258/24 when they observed a red Chevrolet convertible ("the Chevy") driving erratically in the south-bound lane. Hr'g Tr. 4:25, 5:1-3. Highway 258/24 is a five-lane highway, with a center turn lane and two lanes on either side. Hr'g Tr. 17:5-10. Sergeant Ides explained that the Chevy "caught [his] attention" because it "crossed the right fog line; it was riding the right fog line." Hr'g Tr. 5:6-7. The officers began following and observing the Chevy, which then "crossed back over into the left lane of the four lane highway" and "crossed into the left divided line, which . . . crosses off into the center turn lane." Hr'g Tr. 5:9-12. The Chevy continued to change lanes, riding the fog lines and crossing the center dividing line. According to Sergeant Ides, the driver-side tires on the Chevy crossed the center dividing line "at least two or three times." Hr'g Tr. 18:2. Detective Gonzales ran the Chevy's tags, which were valid,

Hr'g Tr. 27:2-4, and informed Sergeant Ides the vehicle was "out of Fayetteville." Hr'g Tr. 24:15. From his vantage point approximately a car's length behind, Sergeant Ides could see two African-American men in the Chevy. Hr'g Tr. 5:20-23. He also "observed a lot of movement within the vehicle." Hr'g Tr. 5:18-19. Specifically, Sergeant Ides saw the passenger lean forward, and both the passenger and the driver reaching back towards the rear seat of the vehicle. Hr'g Tr. 9:22-25, 10:4. The driver of the Chevy also began to tap the brakes. Hr'g Tr. 6:20-21. After following the Chevy for approximately one and a half miles and concerned that the driver might be intoxicated, Hr'g Tr. 25:23-25, Sergeant Ides initiated a traffic stop. Hr'g Tr. 6:23.

After the Chevy stopped, all three officers exited the patrol car, and Sergeant Ides approached the driver side window. Sergeant Ides asked the driver, later identified as Kenneth Shaw, for his driver's license and registration. Hr'g Tr. 7: 4-6. Shaw did not appear to be intoxicated, and Sergeant Ides did not smell any alcohol. Hr'g Tr. 27:9-10. However, when Sergeant Ides processed the information from the driver's license, he learned that Shaw was on probation for robbery and assault with a deadly weapon inflicting serious injury, among other things. Hr'g Tr. 7:19-22. Because of Shaw's probation status, Sergeant Ides understood he could conduct a warrantless search of the vehicle. Hr'g Tr. 8:2. Sergeant Ides returned to the vehicle and asked Shaw "what he was on probation for." Hr'g Tr. 8:6-7. Shaw replied that he was on probation for stealing a vehicle. Hr'g Tr. 8:6-8. At that point, Sergeant Ides "knew [Shaw] was lying." Hr'g Tr.8:8. Sergeant Ides asked if there were any weapons in the vehicle. Hr'g Tr. 8:10. Shaw said no. Sergeant Ides asked Shaw whether "he knew that he was on, him

3

being on probation, that he was subject to search if we feel there's something within the vehicle." Hr'g Tr. 8:16-18. Shaw nodded his head.

Suspecting the presence of weapons, Sergeant Ides decided to search the Chevy. Shaw had already exited the vehicle and Sergeant Sanders, who was standing next to the passenger-side of the Chevy, asked Defendant to get out of the vehicle as well. Hr'g Tr. 9:12-15. Defendant did not respond immediately but eventually complied. Hr'g Tr. 9:16-19. After Defendant exited the Chevy, Sergeant Ides "went directly to where [he] saw . . . the movement" by Shaw and Defendant he had observed earlier, i.e., the rear seat of the vehicle and beneath the front passenger seat. Hr'g Tr. 9:22-25. Sergeant Ides found one firearm wrapped inside a "hoodie" on the back seat, and a second firearm, a nine-millimeter Ruger, beneath the passenger-side seat. Hr'g Tr. 9:25, 10:1-5. Sergeant Ides then placed Shaw and Defendant under arrest and took them to the sheriff's office.

During cross-examination, Sergeant Ides confirmed that at the time of the stop, it was "just starting to get dark" but remained "fairly clear." Hr'g Tr. 12:6-7. It was not raining. Hr'g Tr. 12:13-15. The rear window of the Chevy was clear and not hazed. Hr'g Tr. 22:6-13. Sergeant Ides agreed that when he prepared his report of the incident, he "probably should have" included his observation that the Chevy crossed the center line several times. Hr'g Tr. 18:11. Sergeant Ides denied that Shaw's probation status was the "sole reason" he decided to search the Chevy. Hr'g Tr. 29:25. Rather, Sergeant Ides explained, it was a combination of factors, including the movement he observed in the vehicle, the fact that Shaw was on probation for assault with a deadly weapon, and Shaw's dishonesty about his probation status. Hr'g Tr. 30:11-20. In Sergeant Ides'

4

estimate, the entire stop--from the time it was initiated until the time of arrest--lasted fifteen minutes. Hr'g Tr. 28:22-25.

Defendant presented no witnesses at the hearing, but introduced several exhibits into evidence, including a map and photograph of the highway. DE-48.

## II. LEGAL BACKGROUND

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "'[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable.'" Wilson v. Arkansas, 514 U.S. 927, 931 (1995) (quoting New Jersey v. T.L.O., 469 U.S. 325, 337 (1985)). It is well settled that the "'[t]emporary detention of individuals during the stop of an automobile by the police . . . constitutes a "seizure,"' no matter how brief the detention or how limited its purpose." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). (quoting Whren v. United States, 517 U.S. 806, 809 (1996)). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Whren, 517 U.S. at 810.

"Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." Branch, 537 F.3d at 335. Any ulterior motive a police officer may have for making the traffic stop is irrelevant. Whren, 517 U.S. at 813; *see also* Martin v. Gentile, 849 F.2d 863, 869 (4th Cir. 1988) (observing that even "[s]ubjectively bad intentions on the part of the individual officer will not make a constitutional violation out

5

of an otherwise reasonable seizure."). An officer making a traffic stop may order passengers to get out of the car pending completion of the stop. United States v. Hampton, 628 F.3d 654, 658 (4th Cir. 2010). This may be done "so as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk." *Id.* During such a stop, a police officer may "request a driver's license and vehicle registration, run a computer check, and issue a citation" without offending constitutional imperatives. United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004).

To prolong a routine traffic stop, however, a police officer "must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." Branch, 537 F.3d at 336; *see also* United States v. Rusher, 966 F.2d 868, 876 (4th Cir. 1992) (noting that once the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver "must be allowed to proceed on his way."). "Thus, a prolonged automobile stop requires either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." Branch, 537 F.3d at 336. Likewise, "to conduct a lawful protective search of a stopped vehicle . . . an officer must possess a reasonable belief of both (1) the suspect's dangerousness and (2) the possibility that the suspect might gain immediate control of any weapons inside the vehicle." United States v. Griffin, 589 F.3d 148, 153 (4th Cir. 2009) (citing United States v. Holmes, 376 F.3d 270, 276 (4th Cir. 2004)), *cert. denied*, 131 S. Ct. 1599 (2011).

Whether reasonable suspicion exists depends on the totality of the circumstances, including the information known to the officer and any reasonable inference to be drawn

6

at the time of the stop. United States v. Arvizu, 534 U.S. 266, 273-74 (2002); United States v. Crittendon, 883 F.2d 326, 328 (4th Cir. 1989). Reasonable suspicion is "a commonsensical proposition" properly "crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); *accord* Arvizu, 534 U.S. at 273 (permitting "officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person'") (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). While the reasonable suspicion standard defies precise definition, "it is less demanding than probable cause and 'falls considerably short of satisfying a preponderance of the evidence standard.'" Griffin, 589 F.3d at 152 (quoting Arvizu, 534 U.S. at 274).

With these legal precepts in mind, the undersigned reviews the facts of the instant case.

### III. ANALYSIS

Defendant's argument is two-fold: he contends first, that Sergeant Ides had no lawful grounds to initiate the traffic stop and second, that there was no basis to prolong the stop or search the vehicle. The undersigned disagrees.

#### A. The Initial Traffic Stop was Valid and Reasonable in Length

According to the uncontroverted testimony by Sergeant Ides, he and the other officers decided to stop the Chevy after they observed it driving erratically. Sergeant Ides explained that the Chevy "caught [his] attention" because "it was riding the right fog line." Hr'g Tr. 5:6-7. As they observed the vehicle for approximately a mile and a half,

7

the Chevy continued to change lanes, ride the fog line, and crossed the center dividing line several times. The driver also began tapping the brakes. At that point, Sergeant Ides believed that the driver was potentially intoxicated and initiated the traffic stop. He explained that "when you see driving like that, in my training and experience it's [a] possible intoxicated driver. That was the primary reason for stopping the vehicle, to check it out, make sure the driver was not intoxicated." Hr'g Tr. 25:22-25.

Driving left of the centerline of the highway constitutes a traffic violation. *See* N.C. Gen. Stat. § 20-146(c). Sergeant Ides testified the driver-side tires of the Chevy crossed the center dividing line "at least two or three times." Hr'g Tr. 18:2. This traffic violation alone justifies the initial traffic stop. Branch, 537 F.3d at 335. Further, slow driving and weaving within a lane can give officers reasonable suspicion that the driver is impaired. *See, e.g.*, United States v. Smith, 35 F.3d 557, reported in full, No. 94-5308, 1994 U.S. App. LEXIS 22073, at *5-6 (4th Cir.) (unpublished) (finding that an officer had reasonable suspicion that a driver was impaired where the vehicle was traveling ten miles per hour below the posted speed and was weaving within its lane), *cert. den*., 513 U.S. 1064 (1994); United States v. Banks, 971 F. Supp. 992, 993 (E.D. Va. 1997) (finding that an officer had reasonable suspicion to stop a driver for being either dangerously fatigued or impaired where the vehicle was traveling five to seven miles per hour slower than the posted speed and "weaving to the right of its lane"), *aff'd*, 162 F.3d 1156 (4th Cir. 1998). Although there is no evidence here of driving below the posted speed limit, the uncontradicted testimony establishes that the Chevy was weaving within its lane, riding the fog line, and crossed the center dividing line. The driver also tapped the brakes

8

several times. These facts support Sergeant Ides' reasonable suspicion that the driver was impaired.

In support of his argument regarding the legality of the traffic stop, Defendant cites a recent case from the Supreme Court of North Carolina, State v. Otto, No. 523A11, 2012 N.C. LEXIS 413 (N.C. June 14, 2012), contending the case clarifies that "in order for there to be a lawful stop, there must be more than weaving in your own lane." Def.'s Supplemental Reply 2, DE-52. The court in *Otto* held that, where the defendant was observed constantly and continuously weaving within her lane of traffic over the course of three-quarters of a mile around 11:00 p.m. on a Friday night, these factors were sufficient to create reasonable suspicion that the driver was intoxicated. Otto, 2012 N.C. LEXIS at *9-10. Defendant asserts that, as it was only 8:00 p.m. at the time of the instant stop, with no evidence of any places to purchase alcohol nearby, the officers lacked reasonable suspicion to believe the driver of the Chevy was impaired.

Even if the decision in *Otto* were binding upon this Court, it does not advance Defendant's position. First, as noted *supra*, the traffic violation, standing alone, justifies the stop. Second, contrary to Defendant's argument, the instant case is not one in which officers stopped a car for nothing more than weaving. Here, in addition to crossing the center dividing line two or three times over the course of a mile and a half, the driver of the Chevy was weaving within the lane, riding the fog line, and tapping the brakes for no obvious reason. Based on the totality of these circumstances, the undersigned concludes that Sergeant Ides could reasonably suspect the driver of the Chevy was intoxicated. As

9

such, the initial traffic stop was valid and did not violate Defendant's Fourth Amendment rights.

Nor was the traffic stop overly prolonged. Sergeant Ides indicated that the entire traffic stop lasted no more than fifteen minutes. The Fourth Circuit has repeatedly approved of traffic stops of longer or equal length. *See, e.g.*, United States v. Mincey, 321 Fed. Appx. 233, 241-42 (4th Cir. 2008) (thirty-five minutes); United States v. Jones, 289 Fed. Appx. 593, 599 (4th Cir. 2008) (twenty minutes); United States v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994) (fifteen minutes). As the traffic stop was reasonable both at its inception and in its duration, Defendant's motion to suppress based on his challenge to the stop should be denied.

### B. Defendant Lacks Standing to Challenge the Search of the Vehicle

Next, Defendant challenges the search of the vehicle. The United States Supreme Court has held that passengers are seized in traffic stops and thus may challenge the legality of such stops.[1] Brendlin v. California, 551 U.S. 249, 258 (2007); United States v. Mbom, 413 Fed. Appx. 630, 632 (4th Cir. 2011) (per curiam) (unpublished). Thus, Defendant clearly has standing to challenge the legality of the traffic stop. However, this standing does not extend to Defendant's objections to the search. As a mere passenger, it is well settled that Defendant has no legitimate expectation of privacy in the Chevy that would allow him to contest the search. Rakas v. Illinois, 439 U.S. 128, 148-49 (1978);

---

[1] Although the Government initially argued that Defendant's motion to suppress should be summarily dismissed without an evidentiary hearing because he lacked standing, the Government now concedes that Defendant may properly challenge the initial traffic stop.

10

United States v. Rusher, 966 F.2d 868, 874-75 (4th Cir. 1992). Accordingly, to the extent Defendant objects to the search, the motion to suppress should be denied.

C. **The Search of the Vehicle was Lawful**

Even if Defendant had standing to contest the search, the uncontested evidence shows that the search of the vehicle was lawful. To conduct a valid protective search of a stopped vehicle, an officer must reasonably suspect that the occupants of the vehicle are dangerous, and that they "might gain immediate control of any weapons inside the vehicle." Griffin, 589 F.3d at 153. Here, given the driver's probation status and criminal record, Sergeant Ides clearly had grounds to believe that the occupants of the vehicle were potentially dangerous. Further, Sergeant Ides testified that several factors led him to suspect that the Chevy contained weapons: (1) the probation status of Shaw; (2) the nature of Shaw's past offenses, including assault with a deadly weapon inflicting serious injury; (3) Shaw's lie regarding the nature of the underlying convictions; (4) the movement Sergeant Ides observed within the Chevy. Hr'g Tr. 30:11-20. Regarding the movement, Sergeant Ides specifically saw the passenger lean forward, and both the driver and the passenger reach back towards the rear seat of the Chevy. Faced with these facts, it was imminently reasonable for Sergeant Ides to conclude that there might be weapons within the vehicle, and that these weapons were located in an accessible area--under the passenger side seat and on the rear seat.

Citing to the North Carolina General Statutes, the Government argues that Shaw's probation status authorized the warrantless search. North Carolina law specifically allows a police officer to conduct a warrantless search of a probationer and his vehicle

upon a reasonable suspicion that the probationer is engaged in criminal activity or is in possession of a firearm, explosive device, or other deadly weapon. *See* N.C. Gen. Stat. § 15A-1343(b)(14). However, this statute is effective for crimes committed on or after December 1, 2009. Defendant has attached to his supplemental reply a copy of an August 4, 2011 judgment of the Superior Court, Cumberland County, sentencing Shaw to imprisonment and imposing probation based on his guilty plea to common law robbery. Ex. A, DE-52-1. Because the date of Shaw's offense is listed as August 8, 2008, Defendant argues that N.C. Gen. Stat. § 15A-1343(b)(14) does not apply.

Based on the incomplete record before the undersigned, it is unclear whether N.C. Gen. Stat. § 15A-1343(b)(14) provides additional authorization for the instant search. While Defendant appears to be correct that N.C. Gen. Stat. § 15A-1343(b)(14) would not apply to probation imposed for Shaw's common law robbery, the undersigned does not know--and cannot know, without resorting to research outside the record--whether any additional judgments against Shaw exist that are based on offenses committed on or after December 1, 2009, and the Government has chosen not to provide any additional information.[2] Notably, Sergeant Ides testified that Shaw was on probation for assault with a deadly weapon inflicting serious injury. Defendant has not submitted a copy of that judgment. However, whether N.C. Gen. Stat. § 15A-1343(b)(14) applies is ultimately immaterial to the instant dispute, as it has already been established that Sergeant Ides had reasonable grounds to conduct a protective search of the vehicle.

---

[2] Given its failure to even cite the effective date of the statute, the Government's oversight is unsurprising and indeed, symptomatic of its general inattention to this case.

Because Sergeant Ides had reasonable grounds to believe that the vehicle contained weapons, the search of the Chevy did not violate the Fourth Amendment, and Defendant's motion to suppress therefore lacks merit. Accordingly, the undersigned recommends that the motion to suppress be denied.

IV. **CONCLUSION**

For the reasons stated herein, the undersigned RECOMMENDS that Defendant's motion to suppress (DE-39) be DENIED.

SO RECOMMENDED in Chambers at Raleigh, North Carolina this 30th of July, 2012.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE